RENDERED:  JULY 23, 2021; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2020-CA-0713-MR

SAMANTHA BURGESS (NOW
PHILLIPS)                                                                    APPELLANT


APPEAL FROM HARDIN CIRCUIT COURT
v.          HONORABLE PAMELA K. ADDINGTON, JUDGE
ACTION NO. 08-CI-00043


JASON CHASE AND JOYCE CHASE                                    APPELLEES


OPINION
REVERSING AND REMANDING

** ** ** ** **

BEFORE:  ACREE, CALDWELL, AND LAMBERT, JUDGES.

CALDWELL, JUDGE:  Samantha Burgess (now Phillips) appeals from the Hardin

Family Court's order awarding joint custody and primary residential custody of her

minor child ("Child")[1] with Jason Chase to Child's paternal grandmother, Joyce

---

[1] To protect the privacy of the minor child, we will not refer to her by name but simply as
"Child."

Chase. As the family court erred in determining that Joyce Chase was Child's *de facto* custodian, we reverse and remand for further proceedings.

## FACTS

In November 2005, Child was born to Samantha Burgess and Jason Chase (both then minors). Child's parents were never married to one another. We will refer to both parents by their first names to avoid any confusion posed by later surname changes or by other litigants having the same surname.

In August 2009, the family court entered judgment on Jason's custody petition[2] providing for the parents' joint custody of Child with Jason designated as the "primary possessor parent." The judgment further provided that "parenting time/visitation shall continue as currently exercised" under an agreed order entered in September 2008 and that the family court would exercise continuing jurisdiction over parenting time.[3] Samantha was ordered to pay Jason child support. Neither

---

[2] Jason's petition for custody had been filed in early 2008. At that time, he sought sole custody and requested that Samantha's visitation be supervised.

[3] Under the September 2008 agreed order, Samantha had visitation every other weekend for the next several months subject to certain stated conditions–with visitation initially supervised but progressing to unsupervised overnight visits beginning in late November 2008. In the August 2009 custody decree, the family court provided that Samantha would have parenting time according to the visitation schedule in the September 2008 agreed order, noting this schedule took into account where the parties currently lived. The custody decree further provided that if either party relocated, he or she should file a motion to modify the parenting time schedule. Despite these provisions and a lack of prior motions to modify parenting time or custody, apparently the parties later informally agreed that Child would spend school breaks rather than every other weekend with Samantha–perhaps due to the several hours' distance between Samantha's home in West Virginia and Jason's home in Elizabethtown, Kentucky.

party appealed this judgment and there were no further proceedings regarding custody or parenting time for approximately ten years.[4]

In July 2019, Samantha filed a motion styled as a motion to modify custody. She requested that joint custody continue but that she be named the "primary possessory parent" and that Child be permitted to remain with her at her residence in West Virginia and to enroll in school there.[5] She alleged that Jason had recently been arrested and had "an extensive criminal record including drug related charges in the past few years" and that Child was not properly supervised in his care.

In an affidavit attached to her motion, Samantha averred that Child was currently staying with her for the summer and had been spending all school breaks with her since about 2010. She also averred *inter alia* that Child's relationship with Jason was strained due to his substance abuse and criminal history and that Child suffered trauma due to witnessing Jason overdosing twice.

---

[4] In 2010, the family court granted Samantha's motion to reduce her child support obligation. But there are no documents of any further proceedings in this case after that in the written record until her July 2019 motion.

[5] As Samantha requested that joint custody be continued but that Child essentially spend the majority of time with Samantha as "primary possessory parent," perhaps Samantha's motion could be more accurately termed as a motion for modification of timesharing rather than as a motion for modification of custody. *See Pennington v. Marcum*, 266 S.W.3d 759, 768-69 (Ky. 2008) (discussing how requests for changing the child's primary residence without requesting a change in parental decision-making power–*i.e.*, not requesting a change from joint custody to sole custody–are essentially requests for modifying timesharing rather than custody).

She stated a belief that Child had not spoken to Jason for a few months and that Jason had mostly lived with his mother and younger brother since the decree. She further averred that Jason failed to monitor Child's usage of her cell phone and social media, which she believed Child had been using inappropriately.

Just a few days after Samantha filed her motion in early July 2019, Joyce Chase (Jason's mother) filed a motion to intervene in the proceedings between Jason and Samantha. Joyce alleged therein that she was the *de facto* custodian of Child and submitted a supporting affidavit, in which she asserted she had been Child's primary caregiver and financial supporter for almost thirteen years—since Child came to live in her home in October 2006. She also asserted that Samantha had not paid child support to Jason or the state for Child and that Samantha now owed $47,000 in child support. She admitted that Samantha had paid her $1,000 from a tax refund in 2018 but claimed Samantha never paid her anything else to help provide for Child. She requested that she be declared *de facto* custodian and be awarded custody of Child.

Samantha argued in a written pleading that Joyce lacked standing to intervene because Joyce had not filed a petition for custody under Kentucky Revised Statutes (KRS) 405.020 and did not qualify as a *de facto* custodian under Kentucky law. She requested that the family court dismiss Joyce's motion to intervene and to be declared a *de facto* custodian.

The family court then scheduled an evidentiary hearing to take place in December 2019. According to the family court's written scheduling order, this hearing would address "De Facto Custodian and Custody." At the beginning of this December 2019 hearing, Samantha also requested a ruling on her motion to dismiss Joyce's motion for intervention and *de facto* custodian status. The family court judge orally acknowledged that she would first need to determine whether Joyce should be allowed to intervene and then determine if Joyce qualified as a *de facto* custodian before ruling on Samantha's motion for modification. No one objected to the family court's not conducting a separate prior hearing on intervention and *de facto* custodian status at that time, and all litigants appeared to acquiesce to the family court's having just one hearing on all three issues.[6] So, the family court then proceeded to hear testimony.

Jason, Joyce, and Samantha testified. Joyce also presented the testimony of some family friends and of her adult daughter who had been living with Joyce along with the daughter's own children for several years until a few months beforehand.[7] Jason, who was not represented by counsel at the hearing,

---

[6] Recordings of any hearings prior to the December 2019 evidentiary hearing were not provided as part of the record on appeal for our review. Based on our review of the written record, there was no prior written objection to the family court's having one hearing to resolve the three issues nor did Samantha raise any issue about the lack of separate hearings in her post-trial motions.

[7] Following the presentation of these witnesses' testimony, Child was also interviewed by the family court judge on the record. From our review of the hearing recording, Child's interview did not provide significant additional information–beyond that provided by other witnesses–on

agreed with Joyce that he had waived his superior right as a parent to his mother. He, his sister, and the family friends testified to Joyce being the person who took care of Child, including taking her to the doctor and dentist and being a contact person listed for school. Samantha testified to having sought medical or dental care for Child when needed when Child stayed with her in West Virginia, but she admitted that she had not previously been involved in Child's medical or dental care obtained in Kentucky.

According to some witnesses' testimony, Jason was not living in Joyce's house–apparently to shield Child and others from his drug use–but lived in an outbuilding on her property and came in Joyce's house to eat and use the restroom. There was no dispute that Jason and Samantha had not spoken for many years. And Joyce, rather than Jason, had transported Child to and from exchange places so Child could spend time with Samantha. No one disputed that Samantha had Child with her for almost all school breaks for several years. But according to Samantha's testimony, no one had informed Samantha of Jason's drug use or criminal history or that Jason was no longer living in his mother's house or taking care of Child until very recently.

---

factors affecting *de facto* custodian status. So, we need not further discuss the content of the interview in this Opinion.

Joyce testified to obtaining information that Samantha was $47,000 behind in paying child support. There was no evidence presented of Jason making any effort to collect on any arrearages, however. Samantha testified to having paid some amounts for child support to Joyce via money orders–in addition to the $1,000 paid in 2018 from a tax refund acknowledged by Joyce in a pleading–but to not getting receipts for such amounts. She testified that she had never paid child support through the child support office but instead provided funds in a more informal manner.

In February 2020, the family court entered findings of fact, conclusions of law, and judgment–essentially allowing Joyce to intervene, finding her a *de facto* custodian, and awarding joint custody to Joyce and Samantha but designating Joyce as the "primary residential custodian." Samantha filed a motion to alter, amend, or vacate.

In April 2020, the family court entered amended findings of fact, conclusions of law, and judgment. It concluded that Joyce's motion to intervene with requests for declaration of *de facto* custodian status and custody served the same practical purpose as filing a petition for custody under KRS 405.020. And it concluded that Joyce qualified as a *de facto* custodian, finding that Child had lived with Joyce since Child was about a year old; that Joyce had been Child's primary caregiver and financial provider; and that Joyce had been Child's "acting parent"

for nearly all of Child's life. (Page 7 of Amended Judgment, Record (R.), at 357.)[8] It awarded joint custody to Joyce and Samantha with Joyce having primary residential custody and Samantha having parenting time under certain specified conditions–including supervision of her parenting time and drug testing upon Joyce's request.[9]

Samantha filed a timely notice of appeal, naming both Jason and Joyce as appellees although noting Joyce was not named in the caption on the family court's judgment. On the same day that Samantha's appellate brief was filed, this Court entered an order granting Joyce's counsel's motion to withdraw. Neither Joyce nor Jason filed an appellee's brief.

Samantha's primary argument on appeal is that the family court erred in finding Joyce to be the *de facto* custodian of Child. Neither Joyce nor Jason responded to Samantha's appellate arguments by filing a brief.

According to Kentucky Rules of Civil Procedure (CR) 76.12(8)(c):

---

[8] Although the family court found that Child lived with Joyce since she was about a year old and that Joyce was the "acting parent" for nearly all of Child's life, the family court did not specifically find how long Joyce had been the primary caregiver and financial supporter. (R. at 357.)

[9] We are somewhat perplexed about the reasoning for such conditions (including supervision of parenting time and drug testing at Joyce's discretion) given the lack of presentation of evidence of any substance abuse by Samantha or other endangerment of Child by Samantha at the hearing. Furthermore, there is no recent motion for supervision of Samantha's parenting time in the written record–*i.e.*, not since Jason's 2008 request that Samantha's visitation be supervised–and Samantha indisputably had unsupervised parenting time with Child for many years before the late 2019 hearing.

> If the appellee's brief has not been filed within the time allowed, the court may: (i) accept the appellant's statement of the facts and issues as correct; (ii) reverse the judgment if appellant's brief reasonably appears to sustain such action; or (iii) regard the appellee's failure as a confession of error and reverse the judgment without considering the merits of the case.

However, given the important interests at stake, we decline to exercise our discretion to limit our review in such a manner. *See Roberts v. Bucci*, 218 S.W.3d 395, 396 (Ky. App. 2007) (declining options in CR 76.12(8)(c) given presentation of issues of first impression meriting substantive consideration). *See also Hawkins v. Jones*, 555 S.W.3d 459, 461 (Ky. App. 2018) ("Though we elect not to impose any penalty upon [appellee who failed to file brief] in the present case, we strongly suggest that the best practice is to file an appellee brief, as the failure to do so exposes appellees to the penalties in CR 76.12(8)(c). Furthermore, although not specifically imposing a penalty, without a counterstatement of the facts, we are reliant on [appellant's] statement of the facts.").

## STANDARD OF REVIEW

We review a trial court's factual findings in a custody proceeding for clear error (meaning they shall not be set aside if supported by substantial evidence); however, we review the trial court's application of the law *de novo*. *Ball v. Tatum*, 373 S.W.3d 458, 463-64 (Ky. App. 2012). In this case, Joyce had indisputably provided a great deal of care and financial support to Child but

Samantha had also indisputably continued to exercise her rights to parenting time and had provided for and made decisions for Child during her parenting time. We review the family court's application of the law to these key undisputed facts to determine *de facto* custodian status under the *de novo* standard of review. *Heltsley v. Frogge*, 350 S.W.3d 807, 808 (Ky. App. 2011) (*de facto* custodian determination based on application of law to undisputed facts subject to *de novo* standard of review). *But see Jones v. Jones*, 510 S.W.3d 845, 848-49 (Ky. App. 2017) (citing *Heltsley*, 350 S.W.3d at 808 (Ky. App. 2017) (ultimately concluding that trial court abused its discretion in holding that aunt qualified as *de facto* custodian, after stating: "If, after review, this Court determines the factual findings do not present clear error, the analysis shifts to an examination of the trial court's legal conclusions, looking for abuse of discretion using a *de novo* standard.")).

As quoted by the family court on page six of its amended judgment, KRS 403.270(1)(a)[10] provides in pertinent part:

> "de facto custodian" means a person who has been shown by clear and convincing evidence to have been the primary caregiver for, and financial supporter of, a child who has resided with the person for a period of six (6) months or more if the child is under three years of age and for a period of one year or more if the child is three years of age or older or has been placed by the Department for Community Based Services.

---

[10] The statute was amended effective June 29, 2021. For the purposes of this appeal, we will use the version of the statute in effect at the time the matter was submitted to the trial court.

KRS 403.270(1)(b) reiterates the clear and convincing standard of proof for *de facto* custodian status and further states: "Once a court determines that a person meets the definition of de facto custodian, the court shall give the person the same standing in custody matters that is given to each parent under this section" and other statutes including KRS 403.340 (modification of custody decree).

## ANALYSIS

The family court found that the evidence showed that "Joyce has been the primary caregiver and financial supporter of [Child]" and has "been the acting parent for almost [Child's] entire life." So, it concluded: "Joyce has satisfied the de facto custodian requirements set forth in KRS 403.270." (Page 7 of Amended Judgment, R. at 357.)[11] But as Samantha indisputably continued to exercise her rights to parenting time under the joint custody decree and to provide for and make decisions for Child during her parenting time, the family court misapplied the law in determining that Joyce qualified as a *de facto* custodian.

Our precedent states: "parenting the child alongside the natural parent does not meet the *de facto* custodian standard in KRS 403.270(1)(a)." *Chadwick v.*

---

[11] The family court did not specifically and explicitly state whether statutory requirements for *de facto* custodian status were shown by clear and convincing evidence; instead, it simply stated "Joyce has satisfied the de facto custodian requirements set forth in KRS 403.270." (Page 7 of Amended Judgment, R. at 357.) Although arguably its judgment could be construed as making the requisite findings by clear and convincing evidence since it had earlier quoted KRS 403.270(1)(a)'s requirement for showing *de facto* custodian requirements by clear and convincing evidence, better practice would be for the family court to specifically and explicitly state whether each statutory requirement was shown by clear and convincing evidence.

*Flora*, 488 S.W.3d 640, 644 (Ky. App. 2016) (quoting *Mullins v. Picklesimer*, 317 S.W.3d 569, 574 (Ky. 2010)). Samantha argues that her case resembles that of the young mother in *Chadwick* and that she never "abandoned" Child to Joyce but embraced her role as Child's mother "by parenting her and providing for her, at times to the exclusion of Joyce." (Appellant's brief, p. 7.)

We agree with Samantha that despite Joyce's generous provision of care and financial support, under these facts Joyce was simply parenting Child alongside Samantha due to Samantha's continuing to exercise her parenting time and to provide for and make decisions for Child during such parenting time. So, it was error to accord Joyce *de facto* custodian status. *See Chadwick*, 488 S.W.3d at 645 (upholding trial court's determination that despite grandmother's supplying much of the day-to-day care and financial support for the child during the child's first few years, grandmother did not qualify as a *de facto* custodian due to mother's holding herself out as custodian and also providing care to child). *See also Brumfield v. Stinson*, 368 S.W.3d 116, 119 (Ky. App. 2012) (reversing trial court's determination that non-parents qualified as *de facto* custodians because they had been "co-parenting" and did not literally stand in the place of the mother despite their providing financial support and child care).

As we summarized applicable precedent in *Brumfield*:

> The courts of this Commonwealth have
> consistently recognized the superior right of natural

-12-

parents to the care, custody, and control of their children as well as the constitutionally protected right of a parent to raise his or her own child. *See Moore v. Asente*, 110 S.W.3d 336 (Ky. 2003). Before the family court may find that a caregiver has become the "de facto custodian" entitled to be placed on the same footing as a biological parent in a custody proceeding, the court must determine that the biological parent has abdicated the role of primary caregiver and financial supporter of the child for the required period of time. *London v. Collins*, 242 S.W.3d 351 (Ky. App. 2007). In other words, "one must literally stand in the place of the natural parent to qualify as a de facto custodian." *Consalvi v. Cawood*, 63 S.W.3d 195, 198 (Ky. App. 2001), *abrogated on other grounds by Moore*, 110 S.W.3d 336.

Recently, in *Mullins v. Picklesimer*, 317 S.W.3d 569, 573-574 (Ky. 2010), our Supreme Court reiterated:

> [W]e note that to qualify as a de facto custodian in Kentucky, one must be "the primary caregiver for, and financial supporter of, a child who has resided with the person for a period of six (6) months or more if the child is under three years of age. . . ." KRS 403.270(1)(a). It has been held that parenting the child alongside the natural parent does not meet the de facto custodian standard in KRS 403.270(1)(a). *Consalvi v. Cawood*, 63 S.W.3d 195, 198 (Ky. App. 2001), *abrogated on other grounds by Moore v. Asente*, 110 S.W.3d 336 (Ky. 2003).

Thus, our law is clear that even if a nonparent provides care and/or financial support for a child, if such is in conjunction with a natural parent, the nonparent will not qualify as a de facto custodian. *Boone v. Ballinger*, 228 S.W.3d 1 (Ky. App. 2007).

*Brumfield*, 368 S.W.3d at 118.

Although Joyce generously provided care and financial support to Child for several years when Child and Jason were living with her, Samantha did not allow Joyce to stand in her place as Child's parent nor did she abdicate her own role as primary caregiver and financial supporter. Instead, Samantha continued to exercise her right to parenting time under the joint custody decree and to make decisions and to provide for Child during her parenting time–in addition to providing some financial support for Child's needs incurred in Kentucky. And Joyce thus provided care and financial support in conjunction with Samantha. Thus, the family court failed to correctly apply the law in determining Joyce to be a *de facto* custodian under these facts. Furthermore, we also consider its *de facto* custodian determination to be an abuse of discretion. *See Jones*, 510 S.W.3d at 848-49.

We reverse the family court's determination that Joyce had *de facto* custodian status and remand for further proceedings on Samantha's motion for modification. As we reverse based solely on the family court's error in determining *de facto* custodian status, we decline to reach the merits of other issues raised by Samantha in her brief as unnecessary to our resolution.

## CONCLUSION

For the foregoing reasons, the family court's *de facto* custodian determination is **REVERSED**, and the case is **REMANDED** for further proceedings in conformity with this Opinion.

ALL CONCUR.

BRIEF FOR APPELLANT:                NO BRIEF FOR APPELLEES.

William D. Tingley
Louisville, Kentucky

LeeAnna Dowan
Elizabethtown, Kentucky